CHARLES LEHMAN-CHARLEY v. BARTLETT et al.

(Supreme Court, Appellate Division, First Department.   December 30, 1909.)

1. CORPORATIONS (§ 80*)—SALE OF PREFERRED STOCK—MISLEADING PROSPECTUS.

   Statements in a prospectus inviting the purchase of preferred stock in a cold storage company *held* misleading and contrived to convey the false impression that the company had acquired title to land at a net cost of $550,000, entitling a purchaser of stock to rescind his subscription, and recover the amount paid thereon.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 256; Dec. Dig. § 80.*]

2. CORPORATIONS (§ 80*)—PURCHASE OF STOCK—RIGHT TO RESCIND AND RECOVER MONEY BACK THEREFOR.

   The right to rescind a purchase of stock for false and fraudulent statements inducing it and recover back the money paid therefor is unaffected by a subsequent change in the condition of the corporation which would make the statements true.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 264; Dec. Dig. § 80.*]

3. CORPORATIONS (§ 335*)—PURCHASE OF STOCK—FALSE PROSPECTUS—LIABILITY OF DIRECTOR.

   A director who knowingly issues or sanctions the circulation of a false prospectus containing untrue statements of material facts, the natural tendency of which is to deceive and mislead the community and induce the public to purchase stock is responsible to those who are injured thereby.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1453; Dec. Dig. § 335.*]

4. CORPORATIONS (§ 80*)—PURCHASE OF STOCK—SUIT FOR RESCISSION—RELIEF TO BE AWARDED.

   Where the complaint, in a suit against a corporation and directors to rescind a purchase of stock and recover back the amount paid therefor, averred false representations and rescission, and demanded recovery from defendants of the amount paid, plaintiff, being justified in rescinding the purchase, was entitled to recover from the corporation the money he had paid, and from the individual defendants any damage sustained in consequence of their fraud, but he was not entitled to a lien on real property bought with the proceeds of the sale of stock to him and others.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 264; Dec. Dig. § 80.*]

5. CORPORATIONS (§ 80*)—PURCHASE OF STOCK—ACTION FOR RESCISSION—PARTIES.

   A corporation to which money was paid for stock and directors whose false representations induced its purchase and payment of money to the corporation can be joined in one action to rescind the purchase and recover back the money paid; the individual defendants being liable for the amount thereof.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 264; Dec. Dig. § 80.]

   Scott, J., dissenting.

Appeal from Special Term, New York County.

Action by Charles Lehman-Charley against John R. Bartlett and others.   From a judgment for plaintiff, defendants appeal.   Modified and affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before PATTERSON, P. J., and INGRAHAM, LAUGH-LIN, CLARKE, and SCOTT, JJ.

Wm. G. Peckham, for appellants Tubby and De Selding.

Gould & Wilkie, for appellants Bartlett and Reade-Duane Cold Storage Co.

Howard Taylor, for respondent.

INGRAHAM, J. The action was brought to rescind a purchase of stock of the Reade-Duane Cold Storage Company, defendant, and to recover from the defendants the amount paid for the stock based upon fraudulent statements in a circular alleged to have been issued by the defendants, and upon which the plaintiff relied in making the purchase. The complaint alleges that on about September 14, 1905, the individual defendants, being then directors of the defendant corporation, prepared for general circulation and with the intent that it should be distributed among the public a certain prospectus or circular purporting to be issued by them, and containing representations that "the company has purchased the block of land bounded by West, Duane, Washington, and Reade streets, in the borough of Manhattan, New York City, 270x70 feet, containing about 18,900 square feet. The title to the property is insured by the Title Guarantee & Trust Company of New York. * * * Net cost of land $550,000," and that there was offered for sale a limited amount of the preferred stock of the company at par together with a bonus of common stock; that this circular was sent by the defendant Bartlett to one Gustave Rives in Paris, France, with a letter stating that he had organized the corporation; that he inclosed copies of a circular describing its business location and earning power, and offered Mr. Rives the privilege to subscribe $5,000 or $10,000 or more for himself and his friends under the conditions named in the circular letter; that the company was legally and well organized, and that everything connected with the business as stated was true and the figures given were safe and conservative; that a copy of this circular and letter was given by Rives to the plaintiff, who believed the statements contained in said circular and letter, and relied thereon, and was thereby induced to and did on October 1, 1906, pay to Bartlett $20,-000 in acceptance of the offer of 200 shares of the preferred stock of the company at par with an equal amount of common stock as a bonus; that shortly thereafter the plaintiff received through Rives certificates of stock in the defendant company amounting to $20,000 par value preferred stock and $20,000 par value common stock; that the statements contained in the said prospectus and in the said letter were false; that the company at the time had not purchased any land at all and had not paid $550,000 or any other sum for the same; that the title to its property had not been insured by the Title Guarantee & Trust Company of New York or any other company or person; that, after the defendant had received from the plaintiff the $20,000 and $5,000 from Rives, they purchased in the name of the defendant company an equity of redemption in the block of land subject to a mortgage of $454,000, with the usual charge of scienter and offer to return the stock and disaffirming the purchase. The answer seems to admit the purchase of

the stock by the plaintiff, but denies the other material allegations of the complaint.

Upon the trial the court found that in August, 1906, the defendants Bartlett, De Selding, and Tubby, together with one Hill, prepared and issued for general circulation with the intent that it should be distributed among the investing public for the purpose of inviting subscriptions and raising money a certain circular bearing their names, which contained representations that the defendant corporation had purchased a certain block of land in the borough of Manhattan, thereafter described; that the title thereto had been insured by a title company, and that the land had cost the company net $550,000; that upon this land the company proposed to erect a cold storage building and conduct a cold storage business thereon; that the circular further stated that a limited amount of the company's preferred stock was offered at par with a bonus of an equal amount of paid up common stock, and subscriptions thereunder were invited at once; that these circulars were sent to Paris and one of them reached the plaintiff; that he believed the representations therein contained and set forth to be true, and in reliance thereon and in good faith, in ignorance of the true facts, he paid on September 29, 1906, $20,000, to the defendant corporation, and received in exchange 200 shares of preferred stock and 200 shares of common stock of said company; that the defendants Bartlett, De Selding, Hill, Tubby, and the corporation knew when the circular was prepared or sent out, or at the time when the plaintiff subscribed for the stock and paid his money, that the company had not at these times acquired the title and the land had not cost the company net $550,000, or any other sum; that, after the plaintiff's money was received, it was used by the defendants with other sums in purchasing in October, 1906, the block of land in question, title being taken in the name of the defendant company; that the contract price for this block of land was $550,000, and it was purchased subject to mortgages of $454,000, the difference being paid in cash; that said equity of redemption, together with some small amount of rentals accruing therefrom, is the only asset which the company has or ever has had since the property was purchased; that the plaintiff was deceived and injured by the defendants, except Peet, through the false representations set forth in the circular, and as a conclusion of law that the defendants Bartlett, De Selding, Tubby, and the corporation defrauded the plaintiff, causing him thereby to pay out $20,000 on September 29, 1906, and judgment was directed that the sale to the plaintiff of the 200 shares of preferred stock and 200 shares of common stock of the company be rescinded and declared null and void, that the defendant corporation repay to the plaintiff the sum of $20,000, with interest, that plaintiff be declared to have a lien on the right, title, and interest of the defendant corporation in the premises, allowing the plaintiff to apply at the foot of the judgment for the appointment of a receiver of the real property and for an order directing its sale, and out of the proceeds of such sale the receiver was to pay to the plaintiff $23,523.51, and that the defendants Bartlett, De Selding, and Tubby pay the amount of any deficiency that should arise upon the sale. Judgment was entered in accordance with this decision.

The court also found at the request of the defendants that on March 14, 1906, the defendant Bartlett made a contract with one Roche for the purchase of the premises in question for the sum of $550,000, payable $10 on the signing of the contract, $24,990 on or before April 13, 1906, $175,000 on or before July 12, 1906, and $350,000 to be secured by a purchase-money mortgage upon the property, the deed to be delivered on July 12, 1906; that on July 12, 1906, the defendant Bartlett and the owner of the property entered into a supplemental agreement extending the time for the completion of the contract to September 10, 1906, and that the time to complete the contract was further extended until October 10, 1906; that prior to July 12, 1906, Bartlett had paid to the vendor $25,010 on account of this purchase; that on June 8, 1906, the defendant corporation was organized, and on June 11, 1906, Bartlett conveyed to the company his interest in the contract between himself and the owner of the property; that subsequently the vendor agreed that he would convey the property to the corporation on the payment of $100,000 in cash, instead of $200,000, as required by the first agreement, and on October 8, 1906, this $100,000 cash was paid and the deed delivered; that the property was conveyed subject to a mortgage of $271,000, and Bartlett, to whom the property was conveyed, executed a second mortgage for $183,000, and on the same day Bartlett conveyed the property to the company subject to those mortgages; that at the same time the Lawyers' Title Insurance Company insured the title to the property; that all the money paid for this property was collected from subscribers to the capital stock of the defendant corporation; that the plaintiff, relying upon the prospectus and circular, understood it to aver that the defendant had paid the full price of $550,000 for the land described, and that it held the land free and clear.

Upon the trial plaintiff testified that he was shown this circular of which a copy was introduced in evidence by Rives in Paris, and also a letter from Bartlett to Rives; that he believed what was stated in the letter and circular to be true and relied on the same in making the purchase; that he relied particularly upon the statement in the circular that the company had purchased the land, and that the net cost of the land was $550,000; that they then owned the property and had already purchased it; that they proposed to raise $1,000,000 by a first mortgage on the land; that plaintiff knew it was impossible to raise $1,000,000 by first mortgage on the land if the land was not purchased or if there was any other mortgage on it; that plaintiff understood that the corporation had purchased the property, owned it, and had paid for it the sum of $550,000. Mr. Roche, the owner of the property who conveyed it to the corporation, testified that on March 14th he made a contract to sell the property to Bartlett, and received $10 on account of the purchase price. On March 30th he received $7,000. On April 13th he received $5,000. On March 30th he received a promissory note for $8,000, which was met at maturity. On April 13th he received a note for the balance of the first $25,000 to be paid on account of the property which was paid on June 15th by the defendant corporation. On July 12th he received $15,000 more from the defendant corporation. On October 8th he received a check for $60,000 from the defendant

corporation, and then conveyed the property to Bartlett, who subsequently conveyed it to the defendant corporation. He had executed an agreement to convey the property to Bartlett, by which he agreed to convey the property on July 12, 1906, upon the payment of $25,000 in cash before the 13th of April, 1906, which had been paid, and $175,-000 in cash before July 12th, when the deed was to be delivered. So far as appears at the time of the making and sending of this circular to the plaintiff, this defendant corporation had no assets except this contract upon which it had been paid $25,000. The contract with Roche for the purchase of this real property upon which had been paid $25,000 and upon which a payment of $275,000 was required to be made before the 10th of September, 1906, had been assigned to the defendant and for an assignment of this contract it had issued to the defendant Bartlett common stock of the par value of $1,500,000, and preferred stock to the value of $75,000.

This being the situation, the officers and directors of this company prepared the circular which was sent to the plaintiff, and upon the faith of which he made this investment in the stock of the company. The printed date upon this circular was August 1, 1906, but in the copy sent to the plaintiff that was stricken out, and September 14th written in. The circular recited that the defendant corporation was organized under the laws of the state of New York with an authorized capital stock of $2,500,000 of which $1,000,000 was 6 per cent. preferred stock and $1,500,000 common stock. When this circular was issued by defendant, the whole amount of the common stock and $75,000 par value of the preferred stock had been issued to Bartlett for the contract to purchase the real property for $550,000 upon which had been paid $25,000. The company, therefore, had no common stock to give away to subscribers to the preferred stock, except such as Bartlett contributed. The circular then says:

"The company has purchased the block of land bounded by West, Duane, Washington, and Reade streets, in the borough of Manhattan, New York City, 270x70 feet, containing about 18,900 square feet. The title to the property is insured by the Title Guarantee and Trust Company of New York."

The business which the defendant corporation proposed to engage in was stated. It was also stated that on this block of land will be erected a steel frame structure of 14 stories and basement containing the necessary machinery, equipment, and insulation to furnish cold storage in the upper stories and basement. Under the head of "Cost" the circular said:

"Net cost of land, $550,000. The cost of building, fully equipped and ready for business, including carrying charges during period of construction, will not exceed; $1,200,000, office, legal, organization and administration expenses, including working capital, $100,000. (total) $1,850,000. Of this amount it is planned to raise by first mortgage, $1,000,000. And from the sale of preferred stock at par, $850,000. (total) $1,850,000. The common stock will be distributed in part to subscribers to the preferred stock, under the plan outlined below, and the remainder to Mr. Bartlett and associated in payment for their interest in the property and in the various contracts leases and agreements made by them and for the organization and development of the business."

And the circular then said:

"A limited amount of the preferred stock of this company is offered at par with an equal amount of paid up common stock as a bonus."

And it was signed by the corporation, "J. R. Bartlett, President."

From this circular the plaintiff swears that he was given to understand that the company had purchased this property at a net cost of $550,000 and owned the property free from incumbrances, the cost of which had been defrayed from the sale of the preferred stock, and that the company still had a limited amount of preferred stock for sale which was offered him at par, 200 shares of which he purchased for which he paid $20,000.

I think, taking this circular as a whole, that the plaintiff was justified, in this assumption. In the first place, there is a marked distinction in the circular between what has been done and what the company contemplated doing. The land had been purchased, the title had been insured by a title insurance company, and it was proposed to erect a building upon this land. The net cost of the land was stated to be $550,000. I think any one reading such a statement would be justified in assuming that the defendant company had paid that cost of $550,000 and owned the land, title to which had been insured by a title insurance company. Assuming that it had been the intention of these defendants to make a full and frank disclosure of the situation at the time this circular was sent to the plaintiff, it would have been as follows: We have a contract to purchase this block of land for $550,000, upon which $25,000 has been paid, and the balance we are required to pay by taking the property subject to a mortgage of $275,000, giving back a purchase-money mortgage for $183,000, and the balance to be paid in cash on or before October 10, 1906. To purchase this contract upon which $25,000 has been paid we have issued our stock to the par value of $1,575,000. Would not that have been an entirely different statement from that contained in the circular? In the first place, the net cost of the property to the corporation would be when it acquired title $1,525,000 in stock of the company and $525,000 to be paid when the deed was delivered. In the second place, the company had nothing but a contract to purchase upon which $25,000 of the $550,000 had been paid, instead of the property at the net cost of $550,000. It is quite true that the circular nowhere expressly states that the company had acquired title to the property, or that it paid this net cost of $550,000; but I think' the circular was drawn with the expectation that those facts would be assumed to exist, and that any one reading the circular, especially those not familiar with the methods adopted by promoters of these corporations, would fairly assume that it was intended to convey to them the information that the company had purchased this property, and had paid the net cost of $550,000 in acquiring title to it. And this conclusion would be confirmed by the statement that a limited amount of this preferred stock was not offered for sale. There is nothing at all inconsistent with this conclusion in the statement as to the means by which the

money necessary to enable the company to prosecute its business was to be secured. It was stated that of this amount it was planned to raise by first mortgage $1,000,000 and from the sale of the preferred stock at par $850,000. This, it seems to me, was a statement of the securities of the corporation from the sale of which the cost of the land that had been acquired, and how the cost of a building which the company proposed to erect, and the expenses, including working capital, was to be secured. And the company then said that the common stock would be distributed in part to subscribers to the preferred stock, when, in fact, all the common stock had been issued to Bartlett for his interest in the contract. I think on its face that this circular was most misleading, and was contrived to induce subscriptions to the preferred stock, that it was intended to and did convey the impression that the company had acquired the land at a net cost of $550,000, and that the company offered a limited amount of preferred stock for the purpose of providing for the necessary expenses in erecting the building and carrying out the scheme outlined.

Bartlett was not one of the original incorporators of the company, although it would appear that he was the one that had originally devised the scheme. After the company was incorporated, the directors named in the certificate of incorporation met on June 11, 1906. The defendant De Selding was then elected treasurer and a Mr. Peet secretary. At that meeting Peck resigned as president and Bartlett was elected president of the company and director in place of Peck. De Selding then resigned as treasurer, and Bartlett was made treasurer as well as president. At the end of that meeting the directors were Bartlett, De Selding, Peet, Hill, and Tubby. Bartlett testified that he originally drafted the circular some time in July, and submitted it to the directors and afterwards to the counsel for the company, that corrections were then made in the draft by the defendants and Bartlett together; and finally, after this correction by the defendants, it was printed. This all took place in July. The defendant De Selding, besides being a director, was in actual charge of the property as agent for the collection of rents. Bartlett received this $20,000 from the plaintiff through Rives of Paris, and paid it to the defendant corporation. There had been subscriptions to the preferred stock of the company aggregating $31,500 during June and July. None of the individual defendants denied the testimony of Bartlett as to their connection with this circular, and I think it clear that they are all responsible for its terms and the representations made. The fact that although these representations may be said to be untrue at the time they were made the subsequent acquisition of title by the defendant made them true would not help the defendant in this case, for the action is to rescind the purchase on the ground that the statements which induced it were false and fraudulent when made. It may be that, if the action was to recover for damages for fraudulent misrepresentations, there would be some foundation for the claim that the subsequent acquisition of the property would reduce the plaintiff's damages; but, upon the discovery of the fraud, the plaintiff had a right to rescind

the purchase of the stock and get back his money, and, if the circular contained fraudulent misrepresentations as to the condition of the company at the time it was issued and received by the plaintiff, the plaintiff clearly had the right to rescind the contract, and recover his money. It is settled in this state that a director who knowingly issues or sanctions the circulation of a false prospectus containing untrue statements of material facts, the natural tendency of which is to deceive and mislead the community and induce the public to purchase the stock, is responsible to those who are injured thereby. Morgan v. Skiddy, 62 N. Y. 319; Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376; Coursey v. Morton, 132 N. Y. 556, 30 N. E. 231; Lambert v. Elmendorf, 124 App. Div. 758, 109 N. Y. Supp. 574.

There was one question which was not raised by the defendants which suggested itself to me, and that is as to whether the allegations of the complaint entitled plaintiff to any more than a rescission of the contract of sale and a recovery back of the amount that he paid. The complaint sets out the false representations and rescission, and demands the recovery from the defendants the amount that was paid. The judgment directed is that the defendant corporation which has received the money repay the plaintiff what he paid for the stock, plaintiff to have a lien upon the land for the amount, and the other defendants are held liable for any deficiency. The plaintiff, being justified in rescinding the purchase of the stock, was entitled to recover from the defendant corporation the money that he had paid. He was also entitled to recover from the individual defendants who were responsible for the circular any damage that he sustained in consequence of this fraud. This, I think, was the extent to which the judgment should go. Both the corporation to which the money had been paid and the individual defendants whose false representations induced the purchase of the stock and the payment of the money by the plaintiff to the corporation could be joined in one action, the individual defendants to be liable for the amount that the plaintiff had paid to the corporation. Mack v. Latta, 178 N. Y. 525, 71 N. E. 97, 67 L. R. A. 126. I do not think, however, that the plaintiff is entitled to a lien upon the real property for the amount of the recovery. It is undisputed that other preferred stock was sold, and it would seem that all the money that went to make the last payments made on account of the purchase of the property was the proceeds of the sale of preferred stock. The other holders of preferred stock who furnished the balance of the money necessary to acquire title to the property are not parties to the action, and their right to participate in the amount that this property is worth over and above the mortgages should not be destroyed without giving them an opportunity to be heard.

We think, therefore, that the judgment appealed from should be modified by directing a cancellation of the purchase of stock by the plaintiff, a judgment against the defendant corporation and the individual defendants for the amount due to the plaintiff with interest,

with costs against all the defendants, and the judgment, as so modified, is affirmed, with costs to the plaintiff.

PATTERSON, P. J., and LAUGHLIN and CLARKE, JJ., concur.

SCOTT, J. (dissenting). This action is brought by the plaintiff to rescind a subscription of $20,000 to the preferred stock of the defendant corporation, and to recover the amount of such subscription from the corporation and the individual defendants, who were its directors and who signed a prospectus which induced plaintiff to subscribe, and which he now says contained fraudulent misrepresentations. The complaint asks, and the judgment has awarded plaintiff, a lien on the property of the company for the amount of his subscription. We are all agreed that he is not entitled to such a lien, and the case therefore resolves itself into one for the recovery of damages for false representations. The individual defendants organized the defendant corporation for the purpose of erecting and maintaining a cold storage warehouse in the city of New York. The defendant Bartlett was the active promoter of the enterprise; the defendant De Selding being a real estate agent, and the defendant Tubby an architect. The defendant Bartlett, having found a plot of land which he deemed suitable, made a contract to purchase it from the owner, one Roche, for the sum of $550,000. This contract was executed on March 14, 1906, and provided that title should pass on July 12, 1906, $200,000 to be paid in cash and the balance, $350,000, to remain on bond and mortgage. The defendant corporation was incorporated on June 8, 1906, and on June 11, 1906, Bartlett assigned to it his contract with Roche and all his interest in the property. On July 12, 1906, the time for closing title was extended to September 10, 1906, and Roche promised to further extend it if necessary. Roche also agreed to a reduction of the amount to be paid in cash. Finally title was passed on October 8, 1906, $60,000 being paid in cash, and the balance by the assumption of a mortgage then on the property, and the placing thereon of a further mortgage. Bartlett himself took the deed of the property and executed the bond and mortgage, and simultaneously conveyed title by deed to the defendant corporation. Roche held a policy of title insurance issued by the Lawyers' Title Insurance Company, and defendant corporation upon acquiring the property procured a like policy.

In July, 1906, the prospectus which the plaintiff considers fraudulent was prepared and issued. A copy of it found its way to Paris and came into plaintiff's hands, and he on September 29, 1906, cabled $20,000 to Bartlett as a subscription to the proposed stock. Bartlett paid it over to the defendant corporation, and it formed a part of the $60,000 paid to Roche on the delivery of the deed by him. Since this is simply an action for false pretenses, it may not be amiss to keep clearly in mind the essential elements of such an action. They are nowhere better stated than by Chief Judge Andrews in Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376:

"The essential constituents of such an action have been understood from the time such actions were first maintained. They are tersely stated by Church, C. J., in Arthur v. Griswold, supra [55 N. Y. 400], viz.: 'Representation, falsity,

scienter, description, and injury.' There must have been a false representa-tion, known to be such, made by the defendant, calculated and intended to in-fluence the plaintiff, and which came to his knowledge, and in reliance upon which he in good faith parted with property or incurred the obligation which occasioned the injury of which he complains."

The prospectus of which plaintiff complains stated the organization of the defendant company with an authorized capital stock of $2,500,-000 of which $1,000,000 is 6 per cent. cumulative preferred stock, and $1,500,000 common stock. Then follows the statement which the plaintiff characterizes as false and of which he complains, as follows:

"The company has purchased the block of land bounded by West, Duane, Washington, and Reade streets, in the borough of Manhattan, New York City, 270x70 feet, containing about 18,900 square feet."

The fact is that, when this prospectus was issued and when plaintiff saw it, the company had acquired and held a valid, enforcible contract of purchase of the lot described. The sole foundation for the judg-ment appealed from is that it is inaccurate to say that a company or person has purchased a piece of land, when, in fact, he or it has only entered into a contract for its acquisition, but has not yet actually tak-en title. Such a construction is contrary to the common use of the word "purchase," and is contrary to its definition by the lexicograph-ers. The plaintiff, indeed, goes even further, and insists that the statement that the company had "purchased" the land is equivalent to a statement that it had not only actually acquired title, but had paid the whole purchase price in cash. By no possible construction can the word be given so restricted a meaning when used with reference to the purchase of real estate. As words are used in common par-lance, a statement that the company had "purchased" the land was fully justified by proof that it held an enforcible contract for its ac-quisition, which, in fact, ripened into complete ownership a few days after plaintiff's subscription had been received. If the only ques-tion was that the word "purchase" was prematurely and inaccurate-ly used, it would be immaterial in view of the company's subsequent acquisition of the title. The plaintiff's insistence that the prospectus represented that the property had been wholly paid for, if sustained by the language, would be material. On this subject we are referred to another part of the prospectus, which it is claimed supports the plaintiff's contention in this regard, but which, to my mind, completely refutes it. The part referred to is headed "Cost," and gives an es-timate of the cost of the proposed warehouse, and of the manner in which that cost is to be met. It reads as follows:

Net cost of land.............................................. $ 550,000
The cost of the building, fully equipped and ready for business, in-
  cluding carrying charges during period of construction, will not
  exceed ................................................... 1,200,000
Office, legal organization, and administration expenses, including
  working capital........................................... 100,000
                                                              _____
                                                              $1,850,000
Of this amount it is planned to raise by first mortgage............ $1,000,000
And from the sale preferred stock at par........................ 850,000
                                                              _____
                                                              $1,850,000

"The common stock will be distributed in part to subscribers to the preferred stock under the plan outlined below, and the remainder to Mr. Bartlett and associates in payment for their interest in the property and in the various contracts, leases, and agreements made by them, and for the organization and development of the business."

An examination of this statement should have shown to any one that the land had not been paid for, but that it, with the building, were to be paid for in part by a $1,000,000 mortgage, and in part by the sale of preferred stock. The amount of preferred stock to be sold at par plus the proposed mortgage exactly equalled the estimated cost of the building, including the price of the land. Much stress is laid upon the use of the word "net" with reference to the cost of the land. It seems to be argued that "net" means "cash," and should be read as a representation that the land had been paid for in cash. I am unable to see any foundation for such a contention. The meaning of the word "net" in such conjunction is perfectly clear. It means the total or complete cost. To read it as a representation that the whole cost had already been paid, and that none of the money derived from stock subscription was to be devoted to payment for the land, would be wholly inconsistent with the detailed statement of estimated cost, and the proposed method of raising the necessary money. In my opinion the statement that the company had "purchased" the property was not false, and, if it was, it was immaterial because the result was the same as if it had actually acquired title to the property when plaintiff subscribed. The plaintiff got exactly what the prospectus promised him, except that the hopeful anticipation of the consummation of a profitable venture failed of realization.

In my opinion the judgment should be reversed.